STATE of Wisconsin, Plaintiff-Respondent,

v.

Randall L. BEHNKE, Defendant-Appellant. †

Court of Appeals

*No. 95–1970–CR. Submitted on briefs April 16, 1996.—Decided June 12, 1996.*

(Also reported in 553 N.W.2d 265.)

†Petition to review denied.

44

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Leonard D. Kachinsky* of *Kachinsky Law Offices* of Neenah.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *William C. Wolford*, assistant attorney general.

Before Brown, Nettesheim and Snyder, JJ.

BROWN, J. A jury found that Randall L. Behnke imprisoned, battered and sexually assaulted Antoinette S. He sought and was denied access to certain mental health records of Antoinette which he claimed were material to his defense. He also objected to paying restitution for the cost of Antoinette's postevent psychiatric care on grounds that her condition was due in large part to preexisting problems. He raises those same objections now along with an ineffective assistance of counsel claim.

Regarding the mental health records, we hold that Behnke did not make a sufficient pretrial showing entitling him to trial court review of Antoinette's mental health records. And while his postconviction motion includes newly discovered evidence, it does not convince us that the trial court should review the records. We also affirm the restitution and ineffective assistance of counsel issues.

## FACTS

On the Monday of Memorial Day weekend, May 30, 1994, Antoinette went to Behnke's apartment at his request. They had been dating but had stopped seeing each other. While there, Behnke engaged in certain conduct which frightened Antoinette. She wanted to leave but was told that she should sit down and that she was going nowhere. When she tried to get up and leave, Behnke struck her in the eye and the chest. He then took one of her shoes and her car keys and hid them. During that evening and into the morning, he sexually assaulted her.

While the specific allegations are not relevant to the issues, it is important to point out that Behnke was acquitted of eighteen out of the twenty-three charges. Nonetheless, he was convicted of false imprisonment, three batteries and one sexual assault. The facts supporting false imprisonment have already been detailed. The count of sexual assault the jury convicted Behnke of concerned his biting Antoinette in her genitals. The battery charges he was convicted of consist of having pushed her in the chest three to five times while telling her to sit down as a prelude to the false imprisonment, later hitting her in the eye, and at a different time, slapping her across the face with an open hand.

The sexual assault and battery charges that the jury convicted Behnke of were supported by physical evidence. Antoinette's bruises on the face, eye and chest plus the bite marks on her genital area were all confirmed by a physician who examined her a day after the attack. Further facts will be forthcoming as necessary.

## PRETRIAL REQUEST FOR COURT INSPECTION OF MEDICAL RECORDS

A defendant who seeks access to a witness's medical records must first make a preliminary showing that the evidence is relevant and is necessary to a fair determination of guilt or innocence. *See State v. Shiffra,* 175 Wis. 2d 600, 610, 499 N.W.2d 719, 723 (Ct. App. 1993). Only if this burden is satisfied must the trial court then order that the records be produced and conduct an in camera inspection to determine if the evidence is indeed material to the defense.*See State v. Mainiero,* 189 Wis. 2d 80, 87, 525 N.W.2d 304, 307 (Ct. App. 1994).

To prevail in making the necessary preliminary showing, the defendant must establish more than the mere possibility that psychiatric records may be helpful. *State v. Munoz,* 200 Wis. 2d 391, 397-98, 546 N.W.2d 570, 572-73 (Ct. App. 1996). In fact, the factual background of the published cases in this state regarding a defendant's right to an in camera review of a witness's mental health records show that the defendants in those cases had knowledge of the existence of mental health records and the disputes concerned whether the records were relevant. *See State v. Speese,* 191 Wis. 2d 205, 215, 528 N.W.2d 63, 67 (Ct. App. 1995), *rev'd,* 199 Wis. 2d 597, 545 N.W.2d 510 (1996); *Mainiero,* 189 Wis. 2d at 86, 525 N.W.2d at 306; *see also Shiffra,* 175 Wis. 2d at 603, 499 N.W.2d at 720 (noting that the State turned over information regarding the victim's psychiatric history).

During pretrial proceedings, Behnke moved for an in camera inspection by the trial court of any psycho-

logical or other medical records related to Antoinette's history of self-harm/mutilation. Behnke believed this information might be relevant to the battery charges because the records might allow an inference that Antoinette's bruises were self-inflicted. As an offer of proof, Behnke's counsel explained that Antoinette told Behnke about her history of self-abuse. Counsel also described a specific instance, not long before Memorial Day, where Antoinette told Behnke that she had inflicted cuts and bruises on her arm, although she told others that they were accidental. Counsel also explained that Antoinette personally confirmed that she inflicted these wounds on her arm during cross-examination at Behnke's probation revocation hearing.

The State objected to Behnke's motion, claiming that it amounted to nothing more than a "fishing expedition." It argued that the self-mutilation issue was irrelevant to the charges. The State contended that the real reason for the motion was to search for evidence to discredit Antoinette's character, not to challenge any of the State's specific factual allegations.

The trial court denied the motion holding that the records were not relevant to the nature of the batteries alleged. It reasoned that even if the medical history confirmed self-abuse, such evidence would not be material to the charges that Behnke hit Antoinette in the eye, face and chest because these types of wounds could not be self-inflicted. Although the trial court did not articulate the basis for its conclusion, it undoubtedly determined that a medical history describing Antoinette cutting or bruising herself on the arm would not be relevant to the physical evidence alleged to exist in this case—namely, a black eye and bruises on the chest.

We affirm the trial court's pretrial decision. We agree with the trial court that a history of cutting or bruising oneself on an arm does not lend itself to an inference that other forms of self-abuse, such as beating oneself about the eye and chest, might also be described in a person's medical records. While it is possible that a person's method of self-abuse might include hitting oneself in the eye and about the body, causing bruises, there was nothing before the trial court, other than mere possibility, to alert the court as to the relevance of the records.

Moreover, Behnke only knew what Antoinette had told him—that she had a history of cutting or bruising her arm. While Behnke might well conclude that this is a psychological disorder, he could not well conclude that she had sought and received mental health counseling for the disorder. In short, he did not know if such records existed. This is an added reason why the denial of his motion was not a misuse of discretion.

In fact, we view Behnke's motion as an attempt to accomplish the same type of discovery that is allowed in civil litigation. While in civil cases parties may seek to impose upon opponents the duty of determining whether certain records exist, the criminal discovery provisions do not impose upon the State an obligation to conduct this type of discovery for the defense. *See State v. Chacon,* 50 Wis. 2d 73, 77 n.1, 183 N.W.2d 84, 86 (1971).

### POSTTRIAL REQUEST FOR COURT INSPECTION OF MEDICAL RECORDS

During the pretrial hearing, the State volunteered that it had requested the medical reports from Antoinette's postattack hospital visits and indicated that it

51

intended to turn over any exculpatory information it uncovered. The State noted that these records included information concerning treatment at a mental health facility after the attack. The trial court commented that these records might be relevant because they might be exculpatory regarding the extent of Antoinette's injuries. The records were turned over, and after review, the trial court ruled that they were immaterial and would remain confidential.

After trial, Behnke inadvertently learned of the contents of these records. The clerk's office mistakenly disclosed the postattack records to Behnke's appellate counsel while he was reviewing the trial materials in preparation for his posttrial motion. These postattack records contained specific references to a preattack hospitalization in November 1993.

While the records do not indicate whether the 1993 hospitalization was for a disorder where self-abuse is a symptom, appellate counsel also had the benefit of Antoinette's cross-examination during a posttrial restitution hearing. There, she indicated that she had been hospitalized in November 1993 for depression, alcohol dependency, migraines and posttraumatic stress.

Also, in March 1995, a local newspaper published an interview with Antoinette. In it, she explained that she had been abused by her father and by her former husband. She also reported that she had been hospitalized because she had difficulty responding to those past episodes. The author of the article also described that these earlier traumas caused Antoinette to abuse herself: "she cut herself, using pain to stop the fear." Ed Culhane, *Breaking Her Silence*, APPLETON POST-CRESCENT, Mar. 12, 1995, at A-1, A-9.

Armed with this new information, Behnke renewed his request for an in camera review of Antoi-

nette's mental health records, specifically, the November 1993 records. He again asserted their possible relevance to the battery charges. He also asserted a new theory which he believed warranted review. He now contended that the records might bear upon Antoinette's ability to "accurately recall and provide information about past traumatic events." Behnke now believed that Antoinette could have been confusing the facts of this attack with flashbacks from her earlier psychological trauma and that her credibility could be affected.

The trial court rejected Behnke's motion, again opining that none of Antoinette's injuries could have stemmed from self-abuse and that the November 1993 hospitalization was too remote. The court also rejected Behnke's new theory about her ability to recall past events.

We first note that while the motion asks the trial court to consider evidence newly discovered after trial, nowhere is it claimed that the motion before the trial court was for a new trial based upon newly discovered evidence. There is good reason for this. Behnke was not and is not asking for a new trial. He is asking for a posttrial in camera review by the trial court to see if there is relevant evidence justifying a new trial.

Nonetheless, the factors that courts consider when deciding whether to grant a new trial in the interests of justice based upon newly discovered evidence are the relevant considerations we address now. For this reason, we will cite and use the factors. The requirements are that the evidence must have come to the moving party's knowledge after trial, the party must not have been negligent in seeking to discover it, the evidence must be material, it must not be cumulative and it

must be reasonably probable that a different result would be reached on a new trial. *State v. Boyce,* 75 Wis. 2d 452, 457, 249 N.W.2d 758, 760-61 (1977).

The evidence came to Behnke's attention posttrial; he was not negligent in obtaining it then and it is not cumulative. The only remaining issues are whether he has now shown materiality—a showing he failed to make pretrial—and whether it is reasonably probable that the jury would reach a different result in a new trial.

■

We hold that Behnke has still not met the threshold *Shiffra* test that the sought-after evidence is relevant and may be necessary to a fair determination of guilt or innocence. *See Shiffra,* 175 Wis. 2d at 610, 499 N.W.2d at 723. Behnke now has information that Antoinette received preattack treatment because of psychological trauma. He also now has information, via the newspaper article, that she had been hospitalized because of difficulty responding to past episodes of assault and that she cut herself, using pain, to stop the fear.

The trial court rejected the pretrial motion because the self-abuse history voluntarily given by Antoinette to Behnke related to cutting or bruising her arm. The new evidence does not bring Behnke any closer to showing that the self-abuse was more widespread. We are troubled by what we call Behnke's "spread effect" theory—that if a person is acting out in a particular fashion by abusing oneself in a certain way, it is enough of a probability that he or she is abusing herself in other ways too—thus justifying a look at his or her mental health records to make sure. We, like the trial court, consider the possibility to be

too attenuated. We conclude that the trial court did not misuse its discretion in denying the posttrial motion.

We nonetheless believe that it is appropriate for this court to comment regarding the substantive reasoning of *Shiffra* and the practical effect it has on the courts and litigants. We do so in response to the State's complaint in its brief that it does not like *Shiffra* and reserves the right to have it reviewed by our supreme court. We note that the State has already mounted an assault on *Shiffra* during its arguments to the supreme court in *State v. Speese,* 199 Wis. 2d 597, 610-11 n.12, 545 N.W.2d 510, 516 (1996).

In regard to the substantive reasoning of *Shiffra,* the State argues that the decision wrongly extended *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987), to cover a witness's medical records even when the State does not have possession of, or access to, the records. The State focuses on how the records in *Ritchie* were in the possession of a government agency and thus suggests that the decision was grounded on the constitutional duty of the government to turn over exculpatory evidence to the defendant. *See id.* at 57. In those situations when the State does not have access to the records because the witness has asserted a health care provider privilege, which Antoinette could have done in this case, the State believes that the requirement for an in camera review set out in *Ritchie* should not apply. The State believes that its case should not be hampered by a witness who strives to maintain privacy. Moreover, it sees no potential unfairness in such situations because neither the State nor the defendant can use the records. The playing field is kept completely level.

The State, however, misconstrues the reasoning of *Ritchie* and *Shiffra.* These decisions are not about keeping a level playing field between the State and the

55

defendant. Rather, these decisions attempt to strike a balance between the witness's right to privacy, which is embodied in the health care provider privileges, and the truth-seeking function of our courts, which is rooted in the Due Process Clause of the Fourteenth Amendment. *See Shiffra*, 175 Wis. 2d at 605, 605 n.1, 499 N.W.2d at 721; *see also Ritchie*, 480 U.S. at 56, (rejecting Compulsory Process Clause analysis and instead adopting Due Process Clause analysis); *The Supreme Court, 1986 Term—Leading Cases*, 101 HARV. L. REV. 119, 130-31 (1987). Of course, the conflict between these legislative and constitutional policies most often arises in the context of criminal litigation. But that is to be expected when the legislature establishes a statutory privilege, thereby exempting certain types of information from the judicial forum.

We further acknowledge that the "costs" of the health care provider privileges are principally shifted to the State. In a few circumstances, the State may have to completely forgo a case when one of its witnesses refuses to turn over the information. *See Shiffra*, 175 Wis. 2d at 612, 499 N.W.2d at 724-25. Nonetheless, the Due Process Clause guarantees the defendant a right to a trial based on truth seeking which can only be accomplished by allowing him or her to present a complete defense. *See id.* at 605, 499 N.W.2d at 721. The Due Process Clause thus prevents the State from shifting the costs associated with the health care provider privileges to criminal defendants. If the State sees a problem with these privileges, it should lobby the legislature for a change in the law.

The State also complains about the practical effects of the *Shiffra* decision on its ability to prosecute a case. It believes that forcing the State to pressure its witness into releasing the information or forgoing this

witness's testimony is not fair. The State asserts that it should not be forced to make its witness reveal private information. And a witness, most likely the accuser, should not be forced to disclose private and personal information to have the defendant brought to justice.

These complaints, however, were addressed in *Shiffra*, and the remedy set out in that case is still valid. *See Shiffra*, 175 Wis. 2d at 612-13 n.4, 499 N.W.2d at 725. Before the defendant is allowed access to these records and the witness's privacy is sacrificed, and before the State is faced with the decision of whether it can forgo the witness and still make its case, the records must pass through a private and confidential review in the trial court's chambers. We have complete confidence in this state's trial judges to accurately and fairly balance the witness's right to privacy and the defendant's right to a trial where every piece of evidence material to determining the truth will be considered. *See id.* at 611, 499 N.W.2d at 724. The State overestimates the burden that *Shiffra* places on it and its witnesses.

RESTITUTION

The trial court set restitution at $5341.70. The majority of the award reimbursed Antoinette for her health insurance deductions and copayments. An additional $282.50 went towards the mileage expenses associated with her doctor visits. A very small portion, $20.98, reimbursed Antoinette for a dead bolt lock she purchased to help her feel safe after Behnke's attack. Behnke challenges much of this award.

█
Our review of Behnke's challenges involves a question of whether the trial court misused its discretionary authority over the calculation of restitution. *See State*

*v. Boffer,* 158 Wis. 2d 655, 658, 462 N.W.2d 906, 907-08 (Ct. App. 1990). We may reverse a discretionary decision only if the trial court applied the wrong legal standard or did not ground its decision on a logical interpretation of the facts. *See State v. Rogers,* 196 Wis. 2d 817, 829, 539 N.W.2d 897, 902 (Ct. App. 1995).

Behnke first contends that the trial court ignored his argument that the restitution award should be decreased because much of Antoinette's mental health expenses were for a condition preexisting the attack—namely, the abuse she suffered from her father and her former husband. He repeats now what he claimed at the restitution hearing. Behnke complains that he was not the cause of her mental health treatment. And, even if his actions were a cause, he is only partially responsible—not wholly responsible—for the costs.

In answer, we begin with the observation that trial courts are obligated to consider any possible defense that a defendant could raise in a comparable civil case. *See* § 973.20(14)(b), STATS. Here, Behnke raised two defenses: that he was not liable for the expenses and, if liable, he is only partially so. While he did not cite case law or refer the trial court to any civil jury instructions regarding these defenses, it is readily apparent that Behnke was referring to those defenses set forth in WIS J I—CIVIL 1722 and 1722A and *Anderson v. Milwaukee Ins.,* 161 Wis. 2d 766, 770-71, 468 N.W.2d 766, 768-69 (Ct. App. 1991).

But before the trial court can accurately assess a defense recognized by our law of civil litigation, the defendant must present a tangible record with which the trial court can exercise its discretion. Here, while Behnke articulated his dual legal theories, he did not point to any specific facts from which the trial court

could have grounded the downward adjustment he desired. He did not articulate what facts supported his theory. He did not reveal why and how damages should be limited to account for Antoinette's preexisting mental infirmities or how Behnke's liability should be "shared" with Antoinette's other abusers.

We acknowledge that it is the victim's burden to prove cause. But she did that. She proved that Behnke attacked her and that as a result of her attack, her mental health regressed and she had to return to a mental health setting. That she had been there before and for other reasons is not fatal to her proof since it is only her burden to prove that Behnke's actions were a substantial factor in producing the injury that required treatment. Her burden is not to prove that the actions were the sole factor. *See* WIS J I—CIVIL 1500 cmt. (citing *Pfeifer v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 236-38, 55 N.W.2d 29, 32-34 (1952)).

Moreover, as the State points out, the rule in Wisconsin is that if the defendant's actions were the precipitating cause of the injury complained of, and such injury was the natural consequence of the actions, the defendant is liable, although the victim's preexisting condition might have aggravated the injury. *Anderson*, 161 Wis. 2d at 769, 468 N.W.2d at 768. The victim provided proof that she needed help from mental health professionals *because of* the attack. The attack precipitated her need and her need was the natural consequence of the attack. That she received similar mental health treatment before the attack and that her preexisting condition left her with a vulnerable psyche should not be a tool by which the defendant can escape liability for restitution.

Next, we turn to whether the trial court misused its discretion when it concluded that Antoinette's need for a new lock was a special damage. She testified that she bought the lock two months after the attack because Behnke knew where she lived and she wanted a stronger lock for the door. While she acknowledged knowing that Behnke was in jail pending trial, she was nonetheless afraid because Behnke had previously told her that he was not going back to prison and she thought he might try to escape.

Behnke points out that the offense took place in his residence, not Antoinette's. He notes that there has never been an allegation that he caused damage to her residence. We read his argument to say that Antoinette has failed to prove causation.

The trial court found that the need for a lock was a consequence of Behnke's acts. The facts of record support the trial court's discretionary decision. The trial court then concluded that Antoinette's desire to buy a new lock was a "special damage" and she was thus entitled to restitution. *See* § 973.20(5)(a), STATS., *amended*, 1995 Wis. Act 142, § 8.[1]

We hold that the trial court did not misuse its discretion. Her claim was a "readily ascertainable pecuniary loss" and thus a "special damage" covered by the restitution law. *See State v. Stowers*, 177 Wis. 2d 798, 804, 503 N.W.2d 8, 10 (Ct. App. 1993.) The "special damage" limitation within the restitution statutes restrains the trial court from assessing damages intended to generally compensate the victim for damages such as pain and suffering, anguish or humiliation which are often experienced by crime vic-

---

[1] These amendments do not affect our analysis.

60

tims. *See id.* at 804-05, 503 N.W.2d at 10. While the trial court may not assess these "general damages" as part of a restitution award, any specific expenditure by the victim paid out because of the crime, a "special damage," is appropriate. *See id.*[2] Since there was proof of causation for assessing this "special damage," we uphold it.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Behnke argues on two grounds that his trial counsel did not provide him with effective assistance. First, Behnke claims that trial counsel failed to examine Antoinette on the issue of her alleged history of self-abuse. Next, Behnke contends that trial counsel neglected an opportunity to present certain evidence which would have shown the jury that Antoinette was extremely jealous of Behnke's other girlfriends. This evidence, Behnke asserts, would have revealed that Antoinette had reason to fabricate a story to implicate Behnke and would have substantially impaired her credibility.

We evaluate a claim of ineffective assistance of counsel with a two-pronged test: one, we must gauge whether the attorney's performance was deficient, and two, we must determine if the established mistakes prejudiced the defense. *See State v. Haskins,* 139 Wis. 2d 257, 262, 407 N.W.2d 309, 311 (Ct. App. 1987).

---

[2] We also reject Behnke's ancillary argument that his type of sentence, incarceration in lieu of probation, somehow limits the type of damages which may be awarded as restitution. The statutes plainly permit restitution for "special damages" to be ordered even when the defendant is not placed on probation. *See* § 973.20(1), (5), STATS., *amended,* 1995 Wis. Act 142, §§ 2, 8-10; *see also* Judicial Council Note, 1987, § 973.20.

When a court measures the quality of the attorney's performance, it assesses whether his or her work fell below an objective standard of reasonableness. *See State v. Johnson*, 133 Wis. 2d 207, 217, 395 N.W.2d 176, 181 (1986). The defendant, however, must initiate the analysis by pointing to specific acts or omissions revealing that his or her attorney did not exercise reasonable professional judgment. *See Haskins*, 139 Wis. 2d at 262, 407 N.W.2d at 311.

Our appellate review of a trial court's conclusions about ineffective assistance claims involves a mixed question of law and fact. *Id.* The trial court's assessment of what actually happened, the historical facts, will not be set aside unless clearly erroneous. *See id.* The overall question of whether the representation was deficient and prejudicial, however, is a question of law that we review de novo. *Id.*

We first examine trial counsel's alleged failure to ask Antoinette about her medical history. In its review of Behnke's postconviction motions, the trial court found that trial counsel never explored this issue. But the court nonetheless reasoned that trial counsel exercised good judgment because it had previously determined this matter to be out of bounds.

We agree with the court that trial counsel's failure to press Antoinette about her medical history does not amount to deficient performance. Even though his trial counsel would have met an objection, it seems that Behnke believes that a good trial attorney would have still tried to question Antoinette about her past. Presumably, such questioning would have cued the jury that Antoinette was trying to hide something and was not a credible witness.

If we were to accept Behnke's argument, however, we would implicitly condone a type of courtroom behavior which we have stated should not be attempted by any trial attorney. We recently expressed concern that the type of "performance" Behnke thinks his trial attorney should have given him is becoming all too commonplace in our courtrooms. *See Gainer v. Koewler*, 200 Wis. 2d 113, 121-23, 546 N.W.2d 474, 477-78 (Ct. App. 1996). Contrary to Behnke's expectation, his trial counsel's decision to stay away from areas which the court declared irrelevant was the choice that we *expect* attorneys to make.

Now we turn to the second attack on trial counsel's performance. Here, Behnke complains that his trial counsel overlooked the opportunity to question Antoinette about some of her conduct while she was at the apartment prior to the assault. Behnke claims that Antoinette went into his computerized address book and erased the information. He argues that Antoinette did this out of jealousy over Behnke's relationship with other women.

At the postconviction evidentiary hearing, trial counsel admitted that he knew about this address book issue but could not specifically recall why he did not go into it at trial. The court nonetheless reasoned that trial counsel's neglect to use the "black book evidence" was not a sign of deficient performance. It questioned the probative value of such evidence and wondered whether the meaning of Antoinette's alleged action was ambiguous in light of her testimony that she accidently erased the numbers. The court also noted that other evidence about Antoinette's supposed jealousy had come in from other sources and that the address book evidence would have been cumulative. Finally, the trial

court explained that the jealousy theory basically went to Antoinette's overall credibility. Since trial counsel relied on the inconsistencies in her earlier statements to challenge her credibility during cross-examination, the court believed that Behnke's trial counsel may have simply made a tactical decision not to "push the point in front of the jury at that particular time."

We have reviewed the transcripts and uphold the conclusion that trial counsel's decision to pass over the address book evidence was not a sign of deficient performance. Our examination confirms that Behnke's trial counsel challenged Antoinette's credibility on cross-examination by focusing on the inconsistencies in her prior statements. Since trial counsel obviously made a choice to attack her credibility in this manner, it is apparent that he made a reasonable tactical decision not to start inquiring about the addresses as a separate means of achieving the same result.

Moreover, we agree with the court that trial counsel had previously explored Antoinette's feelings regarding Behnke's other girlfriends during his cross examination of an earlier witness. The address book incident would have been surplusage. In sum, we do not believe that either of trial counsel's alleged errors signals deficient performance. We thus affirm the trial court's decision not to grant a new trial because of ineffective assistance of counsel.[3]

---

[3] Behnke also raises a claim for a new trial in the interest of justice. He contends that the cumulative effect of the errors has prevented the real controversy from being tried. We find no errors. Moreover, we agree with the trial court that justice was accomplished. The trial court noted that the jury acquitted Behnke of many charges and found him guilty of only those

*By the Court.*—Judgment and order affirmed.

charges for which there was corroboration from physical evidence.